THE PISKATAQUA.·

WOODWARD *v.* THE PISKATAQUA.

WARD *et al. v.* SAME.

(*District Court, E. D. New York.* June 16, 1888.)

1. SHIPPING—AFFREIGHTMENT—SEAWORTHINESS—PRELIMINARY SURVEY—PRE-SUMPTION.
   In the absence of any evidence of concealment, latent defect, bias, or fraud, a strong presumption of the seaworthiness of a vessel arises when a preliminary survey has been held by the charterer, and upon such inspection the vessel has been found seaworthy.

2. SAME—SEVERE STORM—LIABILITY.
   Libelant sought to hold the bark P. liable for delivering his cargo of hides damaged, claiming that the vessel, when she sailed from Montevideo for New

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

York, was in an unseaworthy condition. On the evidence, *held*, that the damage arose from the severe storm to which the vessel was exposed during the voyage. and not to unseaworthiness, and that the libel should therefore be dismissed.

In Admiralty.

*J. Adriance Bush*, for libelants.

*Wing, Shoudy & Putnam*, for claimants.

BENEDICT, J. These actions were tried together. They are brought to recover for damages to a cargo of dry ox hides, cow hides, and skins received during a voyage of the bark Piskataqua from Montevideo to New York. The only question presented for determination is whether the vessel was seaworthy at the time she left the port of Montevideo. The contention of the libelants is that the vessel, when she sailed, stood in need of caulking; that one of her bow ports was in bad condition; and that it was by reason of her unseaworthy condition in these particulars that the acknowledged bad condition in which the cargo arrived is to be attributed. On the part of the vessel the contention is that the unseaworthy condition in which the vessel was when she arrived was owing to bad weather encountered during the voyage. The deficiencies found in the vessel on arrival were of two kinds: (1) Open seams and butts in her deck and top sides; (2) an opening in her bow port. In regard to the open seams and butts, several marine inspectors, who examined the vessel after her arrival, have expressed a confident opinion that the condition of the seams and butts, as they found them, cannot be properly accounted for by the weather encountered by the vessel on the voyage. Hence it is sought to be inferred that the seams and butts were in bad condition when the vessel sailed from Montevideo. On the other hand, there is positive testimony from those on board the vessel that the seams and butts were in good condition when she sailed, and that the severe weather which the vessel undoubtedly encountered furnishes a satisfactory reason for the condition of the seams and butts upon arrival. There is one undisputed fact in the case, which, in my opinion, should be conclusive upon this point in a conflict like this, and that is the fact that the charterer in Montevideo, before shipping his cargo, caused the vessel to be inspected for the purpose of ascertaining whether she was in a seaworthy condition or not; and upon such inspection she was found seaworthy. The testimony of the inspector who made the inspection is before the court, and it is clear and positive to the effect that the vessel was then seaworthy, and fit to undertake the voyage in question. This inspection, which seems to have been made in accordance with the local law at Montevideo, was also in accordance with the general maritime law. Provision for such a preliminary inquiry as to the seaworthiness of a ship intended to be freighted is to be found in the Rhodian Laws, in the ordinance of 1681, and in many Codes derived therefrom. Of course, as Valin says, (Comm. vol. 1, p. 654,) such preliminary inspection is not conclusive, because it applies only to external parts. But in the absence of any evidence of concealment, latent defect, bias, or fraud, the presump-

tion from such a preliminary survey is strong. In this connection, the cases cited by the learned counsel from the French law may well be referred to. Thus the court of Bordeaux has decided as follows:

"The certificate of survey on a vessel raises a presumption not only that the ship at the time of her departure was fit for sea, but besides that it was sufficiently staunch in all its parts, and especially in the sheathing, to stand the hardships of the voyage it was to undertake; hence the damages and injuries pointed out in subsequent surveys, either at the port of repair or the port of destination, are presumed to be due to accidents of navigation." Dalloz, 1860, 2, 83.

The court at Havre, in 1878, decided as follows:

"The charterers have much less ground for reclamation because of the result of events occurring after they have definitely accepted the vessel which they themselves, or by their agents, have acknowledged to be in good seaworthy condition to perform the voyage. This was, on the other hand, for the ship-owners, the best evidence of good seaworthy condition which they could have, because it proceeded from their own charterers, interested in the performance of the voyage; wherefore it cannot be allowed that the charterers can come to-day and argue against a fact which they have themselves acknowledged."

This decision is quoted with approval in Desjardin's Droit Maritime, vol. 3, 415.

In a case like this, the preliminary survey proved to have been made in behalf of the charterers is in my opinion decisive. I therefore conclude that the damage in question was not caused by an unseaworthy condition of the vessel in regard to her seams and butts.

As to the matter of the bow port, the evidence makes still more strongly in favor of the ship. For the evidence of the libelant is that, on the ship's arrival, the middle seam of the shutter of the bow port was so open that one inside could see daylight through the seam; and Capt. Cutler says: "I don't think I could have got a seaman to go in her in the condition she was in then." It is impossible to believe that the ship would be put to sea with the bow port in the condition described, and equally incredible that with such a bow port the ship would have passed the inspection instituted by the charterer in Montevideo. There is also in the case evidence tending to show that her bow port had suffered a severe blow.

The evidence of severe weather encountered by the ship is strong. She had one storm of five days, during which the ship worked to northward only about ten miles a day. Upon all the evidence, I am satisfied that it was to the severe storm to which the ship was exposed during the voyage, and not to unseaworthiness, that the damage to cargo complained of should be attributed. The libel must be dismissed, and with costs.